692 So.2d 1207 (1997)
STATE of Louisiana
v.
Troy BENTLEY.
No. 96-KA-795.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 1997.
*1208 William R. Campbell, Jr., New Orleans, for Defendant/Appellant.
Paul Connick, Jr., District Attorney, Terry M. Boudreaux, Assistant District Attorney, Louise Korns, of Counsel, Office of the District Attorney, Gretna, for Plaintiff/Appellee.
Before GRISBAUM, WICKER and DALEY, JJ.
DALEY, Judge.
Defendant, Troy Bentley, appeals his conviction of false swearing, a violation of LSA-R.S. 14:126.1. On appeal, he assigns two errors:
1. The trial court erred in denying his Motion to Quash the Bill of Information.
2. The trial court erred in denying his Motion to Suppress statement. We find that the Motion to Suppress was incorrectly denied and, therefore, reverse the defendant's conviction and remand.

Procedural History
On November 18, 1994, the Jefferson Parish District Attorney filed a Bill of Information, charging defendant with false swearing for the purpose of violating public health or safety, a violation of LSA-R.S. 14:126.1. Defendant was arraigned on November 29, 1994, and pled not guilty.
A trial by jury of six commenced on February 22, 1995. This trial ended when defendant's Motion for Mistrial was granted.
Defendant was tried by a six person jury on May 17 and 18, 1995. On May 18, the jury returned a verdict of guilty as charged. On June 20, 1995, defendant filed a Motion for New Trial. The trial court heard and denied both motions on September 14, 1995. On September 21, 1995, the trial court sentenced defendant to a term of four years at hard labor. On the same day, the state filed a Bill of Information, alleging defendant to be a third felony habitual offender. Defendant filed a Motion for Appeal on September 21, 1995. The trial court granted defendant's motion on September 27, 1995.
On June 20, 1996, defendant admitted the allegations in the multiple bill. The trial court vacated the original sentence, and pursuant to an agreement between defendant and the state, resentenced defendant to four years at hard labor without benefit of parole, probation or suspension of sentence. Defendant filed a second Motion for Appeal on June 21, 1996. The trial court granted the motion on July 1, 1996.

Facts
The instant case arose out of the investigation of the murder of Ann Marie Jenkins and the attempted murder of Jerry Wallace at Wallace's Robinson Avenue home which occurred in the early morning hours of November 2, 1994. At 12:10 p.m. on that day, defendant, Troy Bentley, gave a statement regarding the murder to Detective Alvis West of the Jefferson Parish Sheriff's Office. The interview was conducted at the Detective Bureau of the Sheriff's office. The statement was recorded on tape, and the cassette tape was subsequently transcribed. (State's Exhibits 1 and 2).
In his first statement, defendant maintained that he and a female companion went on foot to Wallace's apartment to buy drugs. As defendant approached the premises, he heard gunfire, then saw several people running from the apartment. According to defendant, these people were known to him as Juvenile, K-9, Carmen, and Michael Lott. Defendant stated that he saw Lott look around nervously, then put a gun in his waistband as he fled the scene.
Defendant entered Wallace's house and saw Ms. Jenkins lying motionless on a sofa in the front room. Defendant then entered the bedroom and saw Wallace lying on the bed, bleeding profusely. Wallace said, "He tried to kill me." Defendant panicked and left the scene without aiding Mr. Wallace. In the course of the interview, Detective West showed defendant a photographic lineup. Defendant selected a photograph of Michael Lott, identifying him as one of the men he had seen fleeing the murder scene. When *1209 the statement was completed, Detective West dropped defendant off at his aunt's house.
Based primarily on defendant's statement, Detective West obtained a warrant for Michael Lott's arrest. Lott was arrested and charged with the murder and attempted murder on Robinson Avenue. During the late afternoon of November 2, officers interviewed several other witnesses in the matter, including Carmen Langsfield, Ken Simmons (K-9), Cedric Byrd, and Wanda Thomas (Lott's girlfriend). None of these witnesses implicated Michael Lott in the murder and attempted murder. Each of them stated that Lott was not at the scene of the crime. These witnesses reported that Nathaniel Johnson, also known as Juvenile, had committed the crimes.
Later that evening Detective West and Sergeant Dennis Thornton picked up the defendant, Troy Bentley, at the home of his aunt and drove him to the detective bureau. Defendant was placed in an office and was interviewed by Sergeant Thornton. At approximately 9:00 p.m., defendant gave a second recorded statement, which was later transcribed. (State's Exhibits 4 and 5).
In his second statement, defendant stated he had not seen Lott at the murder scene. He stated he had given Lott's name in his first statement simply because Lott was someone with whom he did not get along. Defendant told Sergeant Thornton in the second statement that Lott was definitely not involved in the murder.
Defendant was arrested after the second interview and charged with false swearing, violation of LSA-R.S. 14:126.1, based on the false information he supplied to the Sheriff's office concerning Michael Lott.
Detective West testified that some time prior to 9:00 p.m. on the night of November 2, Nathaniel Johnson (Juvenile) confessed to the murder of Ann Jenkins and attempted murder of Jerry Wallace. Johnson told police he shot Wallace after the two argued over some cigarettes. Johnson then shot Ms. Jenkins because he was afraid she would report the first shooting to the police. Johnson was placed under arrest. Michael Lott was released from jail in the early morning hours of November 3, 1994.
At trial, after his second statement was introduced over defense counsel's objection, the defendant testified that his first statement was true. He claimed he lied in the second statement, stating that he had never seen Michael Lott that night, because he feared for his life at the hands of Lott's friends.
ASSIGNMENT OF ERROR ONE
Defendant first asserted that the trial court erred in denying Appellant's Motion to Quash the Bill of Information.
During the course of his trial, defendant alleged that the statute under which he was charged was unconstitutionally vague, arguing the language of LSA-R.S. 14:126.1 is misleading, and does not provide sufficient notice as to what types of conduct are prohibited.
The requirement that legislation not be vague or indefinite is derived from the due process clauses of the United States and Louisiana constitutions. In State v. Greco, 583 So.2d 825, 828 (La.1991), the Court stated the following concerning vagueness:
"[A] statute is unconstitutionally vague if any ordinary person of reasonable intelligence is not capable of discerning its meaning and conforming his conduct to it. State v. Powell, 515 So.2d 1085 (La.1987); State v. Broom, 439 So.2d 357 (La.1983); State v. Stilley, 416 So.2d 928 (La.1982); State v. Baron, 416 So.2d 537 (La.1982). In addition, a penal statute must provide adequate standards by which the guilt or innocence of the accused can be determined. See State v. Broom, supra; State v. Union Tank Car Co., 439 So.2d 377 (La.1983)." State v. Barthelemy, 545 So.2d 531, 532-533 (La.1989).
In State v. Deutch, 245 La. 819, 161 So.2d 730, 736 (La.1964), the Court quoting United States v. National Dairy Prod. Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963) stated:
"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is *1210 proscribed. * * * In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged. * * *"
Defendant complains that the term "false swearing," as used in the title of the statute, is misleading, in that it implies that a statement must be made under oath to be in violation of the statute. Defendant did not give either his first or his second statement under oath. Although the statute's title is somewhat misleading, the body of the legislation is unambiguous. The pertinent portion of the statute provides:
No person shall make a false statement, report or allegation concerning the commission of a crime for the purpose of violating, disrupting, interfering with or endangering the public health or safety, or to deprive any person or persons of any right, privilege or immunity secured by the United States Constitution and laws or by the Louisiana Constitution and laws.
We find that a person of "reasonable intelligence" should be able to discern the statute's meaning, and to conform his conduct to it. In determining a statute's constitutionality, penal statutes must be "given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." LSA-R.S. 14:3; State v. Azar, 539 So.2d 1222 (La.1989), cert. denied, Azar v. Louisiana, 493 U.S. 823, 110 S.Ct. 82, 107 L.Ed.2d 48 (1989). Put simply in the context of this case the statute prohibits the making of a false statement concerning the commission of a crime for the purpose of endangering someone or depriving them of their rights. Citizens have the right not to be arrested and falsely accused. Under these rules of construction, LSA-R.S. 14:126 offers a clear standard of conduct. The Motion to Quash was rightfully denied by the trial court.

ASSIGNMENT OF ERROR TWO
Defendant also asserts that the trial court erred in denying defendant's Motion to Suppress Statement.
On December 14, 1994, defendant filed a pretrial Motion to Suppress Confession, in which he moved the trial court to deny the admission of the recorded statement he made to Sergeant Thornton. Defendant alleged that he was not advised of his Miranda rights prior to giving said statement. The trial judge denied defendant's motion on February 22, 1995. Defendant here reasserts the argument he raised in his pretrial motion.
Before a defendant's confession or inculpatory statement may be introduced into evidence, the state is required to prove beyond a reasonable doubt that the statement was made freely and voluntarily and was not made under the influence of fear, duress, intimidation, threats, or promises. LSA-R.S. 15:451; LSA-C.Cr.P. art. 703(D); State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Simmons, 95-309 (La.App. 5 Cir. 10/18/95), 663 So.2d 790; State v. Dunn, 94-776 (La. App. 5 Cir. 2/15/95), 651 So.2d 1378. If the statement was elicited during custodial interrogation, the state must also show that defendant was advised of his constitutional right to consult an attorney and the privilege against self-incrimination, as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Green, 94-0887 (La.5/22/95), 655 So.2d 272; State v. Castillo, 389 So.2d 1307 (La.1980), cert. denied, 453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1004 (1981); State v. Dunn, supra. Article I, Section 13 of the Louisiana Constitution of 1974 requires that:
[w]hen any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel, and if indigent, his right to court appointed counsel.
Defendant asserts that Detective West and Sergeant Thornton were aware that there was a second suspect in the murder of Ann Marie Jenkins before they picked him up for questioning on the night of November 2, 1994. Defendant argues that at the time he gave his second statement, he was under suspicion for false swearing, and that Sergeant *1211 Thornton's questioning was aimed at eliciting a confession. The state maintains that the officers were not required to administer Miranda warnings to defendant, because his interview with Sergeant Thornton cannot be considered a "custodial interrogation."
In Miranda, the United States Supreme Court observed: "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 443, 86 S.Ct. at 1612.
In the instant case, defendant testified that on the night of November 2, Detective West and Sergeant Thornton went to his aunt's house, where defendant was sitting on the porch. Each officer held defendant by one arm and escorted him to their car. They pushed defendant into the car, and drove him to the Detective Bureau. Sergeant Thornton did not read defendant his rights, nor did he tell defendant he was suspected of any crime. Defendant stated that when he and the officers arrived at the Detective Bureau he saw Nathaniel Johnson in one of the interrogation rooms. Sergeant Thornton was asked by his superiors to conduct a second interview with defendant after it was suspected that Michael Lott was not the perpetrator. When defendant gave his statement he did not know Nathaniel Johnson had confessed to the murder. Sergeant Thornton and defendant were alone in an office during the interview, and the office door was closed. According to defendant, Sergeant Thornton turned off the tape recorder several times during the interview; Sergeant Thornton told defendant he knew defendant had lied in his first statement, and he would get defendant to tell the truth if it took all night; Sergeant Thornton told defendant several times that he was not going to leave until he "got this right."
Defendant testified that he felt as if he were in custody, and was not free to leave. He claims he asked to leave at one point, and was refused. Defendant testified that immediately upon completion of the statement, Sergeant Thornton stood up, handcuffed him and told him he was under arrest. Sergeant Thornton did not tell him what the charge was. Defendant testified that he was truthful in his statement to Detective West and that he recanted this statement in his statement to Sergeant Thornton because he feared retribution from Michael Lott's friends.
According to Sergeant Thornton, Detective West asked defendant to accompany them to the Detective Bureau, and defendant complied. The officers did not handcuff defendant. Defendant sat in the back seat of the police unit. Sergeant Thornton's objective, as assigned by his commander, was to determine whether defendant would stand by his original claim that he saw Michael Lott fleeing with a gun from the murder scene.
Sergeant Thornton testified that he did not read defendant his Miranda rights prior to taking his statement because he considered defendant a witness rather than a suspect. Sergeant Thornton stated that it is common practice in homicide investigations to interview witnesses more than once. Had defendant been a suspect, Sergeant Thornton said, he would have been advised of his rights. Upon completing the statement, Sergeant Thornton left defendant in the office, and went to report his findings to his superior, Lieutenant Buras. According to Sergeant Thornton, he left Detective West and Lieutenant Snow to monitor defendant. Sergeant Thornton then went to work on another investigation. One hour later, Sergeant Thornton was advised that defendant would probably be arrested. Sergeant Thornton testified that he did not know precisely when defendant was placed under arrest, but he believed the arrest was effected at the Detective Bureau.
Detective West testified that when he and Sergeant Thornton picked defendant up at his aunt's house, they already knew Nathaniel Johnson (Juvenile) had confessed to the murder and attempted murder. Additionally, the other witnesses did not place Michael Lott at the crime scene. However, they remained unsure as to whether Johnson was the only individual involved in those crimes. Detective West further testified that defendant came of his own accord to make his first statement on the afternoon of *1212 November 2, and he considered defendant a witness.
It is apparent from the record that the interview with Sergeant Thornton was a "custodial interrogation." Sergeant Thornton testified he believed defendant knew he was free to leave the Detective Bureau at will. However, Sergeant Thornton admitted he did not inform defendant he was free to leave. Moreover, defendant did not leave the Detective Bureau even after the statement was completed. He was either arrested immediately (as defendant testified) or he was made to stay at the Detective Bureau until such time as the officers made the decision to arrest him. The reasonable interrogee, faced with this scenario, would not feel free to refuse to go with the two officers when requested to do so, or to refuse to answer the questions such as those put to defendant.
While defendant was not a suspect in the homicide he obviously was suspected of giving police a false statement. The questions Sergeant Thornton asked defendant appear to have been calculated to elicit a confession.
In his first statement, Bentley describes with some detail Lott's behavior at the crime scene. He was the last to leave the apartment, he tucked a gun into his pants, he looked around and acted very nervous, like someone who was under the influence of heroin and cocaine. Additionally, Bentley said that Lott had been at the apartment earlier in the evening during a heated game of shooting dice. Then in the second statement, Bentley admits that in fact, Lott was not present at all when Bentley discovered the shooting, and that he was not among the individuals Bentley saw fleeing the scene.
The fact scenario in the instant case is similar to that in State v. Menne, 380 So.2d 14 (La.1980), cert. denied, Louisiana v. Menne, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39. The defendant in that case was questioned by police regarding a murder, and he denied any involvement. When police later learned the defendant had once owned the murder weapon, an officer telephoned him and asked him to come to the police station for questioning about the weapon. Defendant agreed, and was taken to the station in a police car. The defendant was not advised of his constitutional rights, nor was he informed that he was not under arrest or that he was free to go if he wished. An officer interrogated the defendant for an hour, then told defendant he did not believe he was being truthful. The result of the questioning was that defendant confessed to the killing.
The Louisiana Supreme Court found, when viewing the evidence from the standpoint of a reasonable interrogee, that the defendant was deprived of his freedom of action in a significant way. The court reached this result despite the fact that defendant had not been physically restrained or told he was under arrest. The court reasoned:
It is ... clear from the facts in the present case that Menne, who was not informed that he was under no compulsion to appear or to remain at the police station, was led to believe, as a reasonable person, that he was not at liberty at least from the time the officers informed him they did not believe his story because he had been the last person with the murder weapon before it was found in the victim's car.
Menne, 380 So.2d at 18-19.
Admissibility of a confession is in the first instance a question for the trial judge, and his conclusions on credibility and weight of testimony relating to the voluntary nature of a statement will not be overturned unless they are not supported by the evidence. State v. Hamilton, 94-696 (La.App. 5 Cir. 12/14/94), 648 So.2d 939.
In the instant case, the detectives' testimony is clear that they had a very good idea that Bentley had lied in his first statement regarding Lott's involvement in the homicide. Almost immediately in the transcription of the second statement, the detective tells the defendant that it has been brought to the police's attention that Bentley did not see Lott at the crime scene. Three questions later, Bentley asks the officer to stop the tape. When questioning resumes, the first question is did the defendant see Lott on the scene at all, whereupon he answers no, and admits he did not see Lott at all that night. It is at least at this point, if not for the entire interrogation, that the officers clearly knew that Bentley's first statement was false. Before *1213 a custodial interview a Miranda warning must be given or the statement is inadmissible.
The trial judge's refusal to suppress defendant's second statement was reversible error. The defendant's conviction is vacated and the case is remanded for further proceedings.
REVERSED AND REMANDED.