934 So.2d 280 (2006)
STATE of Louisiana
v.
Phillip LANDE.
No. 06-KA-24.
Court of Appeal of Louisiana, Fifth Circuit.
June 28, 2006.
*284 Charles C. Foti, Jr., Attorney General, Mary E. Hunley, Assistant Attorney General, State of Louisiana, Department of Justice, Baton Rouge, LA, for Plaintiff/Appellee.
Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Jacquelyn F. Maloney, Martin A. Belanger, Assistant District Attorneys, Twenty-Fourth Judicial District, Parish of Jefferson, State of Louisiana, Gretna, LA, for Plaintiff/Appellee.
Shane P. Landry, Salvatore Panzeca, Attorneys at Law, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
MARION F. EDWARDS, Judge.
Defendant, Phillip Lande, appeals his conviction on two counts of aggravated incest. For the reasons that follow, we affirm and remand to correct an error patent on the face of the record.
Defendant, Phillip Lande ("Lande"), was charged in a bill of information on September 19, 2003 with five counts of aggravated incest, in violation of LSAR.S. 14:78.1, involving three different juvenile victims. He pled not guilty and filed several pre-trial motions. Lande proceeded to trial on February 22, 2005. After seven days of trial, a six-person jury found Lande guilty as charged on counts one and four, relating to the aggravated incest of C.M., and not guilty on counts two, three, and five. Lande was subsequently sentenced to fifteen years at hard labor on each of the two convictions, which were ordered to run concurrently with each other.
The State filed a multiple offender bill of information alleging Lande to be a second felony offender based on a prior conviction for possession of cocaine. Lande denied the allegations in the multiple bill and a hearing was set. Defendant was adjudicated a multiple offender and re-sentenced as such to fifteen years on each count one and four without the benefit of probation or suspension of sentence.
On July 14, 2001, defendant married S.L., who had three minor children, V.M., N.M., and C.M., from a previous marriage.[1] In June 2003, Detective Brian McGregor, with the Kenner Police Department, received a complaint from the children's stepmother, Maria, who was married to the children's biological father. Maria indicated that the three girls may have been victims of sexual molestation. Detective McGregor advised Maria to bring the children to the Kenner Police Department where he individually interviewed them. The children were later interviewed at the Children's Advocacy Center ("CAC") and subsequently examined at *285 Children's Hospital. As a result of the investigation, Lande was arrested.
At trial, C.M., who was twelve years old at the time of trial, testified that, while Lande lived with them in the family home, he showed her pornographic magazines and made her watch pornographic movies on television on several occasions. She explained the men and women on the television were naked and having sex. C.M. also stated defendant made her touch his "private part" on more than one occasion. She recounted the first time Lande made her touch him, which was after Lande and her mother married. C.M. testified Lande called her into his room, locked the door, told her to sit down, put lotion on her hand, and told her to rub lotion on his private part. She stated this occurred while naked people were on the television having sex. C.M. stated she "rub[bed] his private part until white stuff came out." She testified Lande threatened to knock her teeth out if she told anyone. C.M. stated that, once they moved into an apartment and defendant was no longer living in the family home, she confided in her mother that Lande made her touch him. C.M.'s mother confirmed that C.M. disclosed the incident in May or June of 2003 but testified she did not report the matter to the police because she thought C.M. had already told her father. C.M. testified she told her father about the incidents two days after confiding in her mother. C.M.'s father stated he learned of the abuse through his wife, Maria, who was told by her daughter in whom N.M. had confided. Upon learning of the abuse, C.M.'s father confronted all three girls and the girls' mother before involving the police.
Defendant argues in his second assignment of error[2] that the aggravated incest statute, LSA-R.S. 14:78.1, is unconstitutionally vague. He contends the statute is confusing because it fails to specifically include the requirements of consanguinity and marriage or intercourse, which is required in the more general statute of incest, LSA-R.S. 14:78. Lande asserts aggravated incest seeks to aggravate the simple crime of incest by adding certain circumstances but omits necessary elements for establishing basic incest, that of consanguinity and marriage or intercourse. Lande contends a reading of the two statutes together leads one to reasonably conclude that the State has to first prove incest, by showing consanguinity and marriage or intercourse, before proving an aggravation of the crime. He points out that he was convicted without proof of consanguinity.
On the fifth day of trial, February 28, 2005, Lande filed a written motion to quash the bill of information on several grounds, including a claim that LSA-R.S. 14:78.1, the charged offense, was unconstitutionally vague because it omits the element of consanguinity, which is required for incest under LSA-R.S. 14:78. The motion was argued and denied outside the presence of the jury.
The due process clauses of the United States and Louisiana constitutions *286 require that legislation not be vague.[3] "The constitutional guarantee that an accused shall be informed of the nature and cause of the accusation against him requires that penal statutes describe unlawful conduct with sufficient particularity and clarity such that ordinary persons of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto."[4] Additionally, a penal statute must provide adequate standards by which the guilt or innocence of the accused can be determined.[5] Thus, to satisfy due process, the language of a statute must have a generally accepted meaning "so that a person of ordinary and reasonable intelligence is capable of discerning its proscriptions and is given fair notice of the conduct which is forbidden by its terms."[6]
Criminal statutes are subject to strict construction under the rule of lenity.[7] As such, criminal statutes are narrowly interpreted and any ambiguity in the substantive provisions of a statute is resolved in favor of the accused.[8] The rule of strict construction is not to be applied with "such unreasonable technicality as to defeat the purpose of all rules of statutory construction, which purpose is to ascertain and enforce the true meaning and intent of the statute."[9]
Criminal statutes must be "given genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision."[10] When a person of reasonable intelligence cannot discern the statute's meaning and is unable to understand what conduct is proscribed, the statute is unconstitutionally vague.[11]
A statute is presumed to be constitutional and should be upheld whenever possible. The party who attacks the statute bears the burden of clearly establishing its unconstitutionality.[12]
The incest statute, LSA-R.S. 14:78, provides in pertinent part:
§ 78. Incest
A. Incest is the marriage to, or sexual intercourse with, any ascendant or descendant, brother or sister, uncle or niece, aunt or nephew, with knowledge of their relationship.
B. The relationship must be by consanguinity, but it is immaterial whether the parties to the act are related to one another by the whole or half blood.
Aggravated incest is provided for in LSA-R.S. 14:78.1 as follows:
§ 78.1 Aggravated incest
A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, *287 step, or adoptive relatives: child, grandchild of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.
B. The following are prohibited acts under this Section:
(1) Sexual intercourse, sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
(2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.
Lande asserts that because LSA-R.S. 14:78.1, aggravated incest, does not require consanguinity like the more general incest statute, LSA-R.S. 14:78, it is unconstitutionally vague. He reasons it is vague because when the two statutes are read in pari materia, a reasonable person is led to believe that consanguinity is required under R.S. 14:78.1, even though the statute does not expressly include the element. In support of his position, Lande argues aggravated incest intends only to enhance the penalty for incest "because of the tender age of [the] incestuous partner." He contends R.S. 14:78.1 is poorly drafted because instead of setting forth aggravating circumstances for incest, it adds other nominate crimes under certain circumstances while leaving out the necessary elements of consanguinity and marriage or intercourse, which a reasonable person would think was a required element.
The Second Circuit addressed this identical issue in State v. Whitt,[13] and upheld the constitutionality of LSA-R.S. 14:78.1. In Whitt, the defendant argued LSA-R.S. 14:78.1 is unconstitutionally vague because it does not include the element of consanguinity contained in the basic incest statute. The Whitt defendant maintained that aggravated incest is an enhanced penalty for incest and, thus, the failure of LSA-R.S. 14:78.1 to include consanguinity as an element of aggravated incest confuses the public as to whether the relationship of the parties must be by consanguinity to support a conviction under Section 78.1.
The Second Circuit concluded that consanguinity was irrelevant to the prohibitions of the aggravated incest statute. The court explained:
the incest and the aggravated incest statutes are intended to protect a broad spectrum of important state interests. The incest statute proscribes only conduct that may lead to genetically deficient offspring. The aggravated incest statute punishes the sexual exploitation of minors by family members and prohibits sexual relationships between family members.[14]
The court further explained aggravated incest was not an enhanced penalty for incest. It referenced other statutory schemes where the aggravated offense shares the definition of the basic offense, such as battery,[15] and those schemes *288 where the aggravated offense refer to the least severely punishable offense for their elements, such as aggravated crime against nature.[16] The court noted that aggravated incest and incest neither share a basic definition of "incest" nor does the aggravated incest statute refer to, include, or incorporate the incest statute or the elements contained therein.
The Whitt court found the aggravated incest and incest statutes "are wholly self-contained, punishing acts plainly defined against persons clearly enumerated."[17] The court determined that a person reading the statutes would know what conduct the statute prohibits and to whom the prohibited conduct applied. Therefore, because the statute adequately notifies the public of what conduct is prohibited, the aggravated incest statute was not unconstitutionally vague.
We hereby adopt the holding and reasoning of Whitt as applicable to the present case. A reasonable person would not assume one offense incorporates the elements of another offense, without a direct or indirect reference, simply because the two offenses are located in close proximity to each other in the criminal code. As noted by the Second Circuit, the offenses of incest and aggravated incest are self-contained. Incest is the marriage or sexual intercourse with blood relations. Aggravated incest is certain sexual behavior within a blood or marriage familial relationship. The aggravated incest statute specifically lists the prohibited acts and clearly defines those persons to whom the proscription applies within the statute. As such, a person of reasonable intelligence should be able to discern the statute's meaning and be able to understand what conduct is proscribed.
Accordingly, we find that the statute is not unconstitutionally vague.
Next, Lande argues the evidence was insufficient to convict him of the two counts of aggravated incest with C.M. on two grounds.[18] First, he alleges the State failed to prove his status as C.M.'s stepfather at the time of the acts. He contends the bill of information includes a period of time prior to his marriage to C.M.'s mother and asserts the evidence conflicted as to whether the acts took place before or after the marriage. Thus, Lande argues there *289 was reasonable doubt whether defendant was C.M.'s stepfather when the offenses took place. Second, Lande challenges his conviction as to count one, aggravated incest by indecent behavior with a juvenile, on the basis the evidence failed to show that the "pornographic" material shown to C.M. was lewd or lascivious. He maintains C.M. testified that the material only showed naked people, and it is not axiomatic that such material is lewd or lascivious.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt.[19] Under Jackson, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt.[20]
The testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.[21] In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness' testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding.[22]
Lande was charged with and convicted of two counts of aggravated incest of C.M. in violation of LSA-R.S. 14:78.1. Aggravated incest is engaging in any of the prohibited acts specified in the statute, including indecent behavior with a juvenile and sexual battery "with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild or any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece."[23]
Lande first challenges the required stepparent relationship at the time of the alleged acts. The bill of information alleged the acts constituting aggravated incest occurred between June 1, 2001 and November 20, 2002. The evidence at trial showed that Lande moved into the family home in either 1999 or 2000 but did not marry C.M.'s mother until July 14, 2001. Thus, there was a period of time alleged in the bill of information where the stepfather/child relationship did not exist for purposes of aggravated incest.
Lande claims the State failed to prove the alleged acts with C.M. occurred after the July 14, 2001 marriage. He argues the evidence conflicts as to whether the incidents took place before or after the marriage. Specifically, defendant asserts C.M.'s testimony was inconsistent.
C.M., who was twelve years old at the time of trial, testified that Lande showed her magazines with women, some of whom were wearing clothes and some of whom were not, and showed her a television show *290 that showed naked men and women making out and having sex. C.M. could not remember the time period that Lande starting living with her, her mother, and her two sisters, but stated he lived with them for some time before marrying her mother. On direct examination, C.M. testified that the incidents of pornography and touching occurred after defendant married her mother. On cross-examination, C.M. could not recall the dates of each incident but testified they all occurred in the summer of 2001 or 2002. On redirect, C.M. stated she was around eight years old and in second grade when defendant made her touch him. The record shows C.M.'s date of birth is December 2, 1992; thus, making her eight years old in the summer of 2001.
In addition to C.M.'s trial testimony, the State offered the videotape of her interview at the CAC on June 20, 2003 and the audio tape and transcript of C.M.'s interview at Children's Hospital on June 24, 2003. During her interview at the CAC, C.M. initially indicated she could not remember when the incidents happened but later stated the incidents happened when she was eight or nine years old. She also stated that, although she was unsure, the incidents occurred while she was in second and third grade. When C.M. was interviewed at Children's Hospital a few days later, she stated the incidents happened when she was eight or nine years old.
Contrary to defendant's assertion, C.M.'s testimony was consistent. C.M. testified she was around eight or nine years old when the incidents occurred and they occurred after Lande married her mother in July 2001. Since C.M. was in the wedding, it would seem the wedding was a marking event in her life that she would remember. C.M. testified that, at the time of the wedding, she was happy to see her mother marry Lande. She stated she changed her mind after Lande started "making her do stuff." Prior to trial, C.M. had not been given a reference point but had only been asked when the incidents occurred. Once given a reference point of before or after the wedding, C.M. testified the incidents occurred after the wedding. Such testimony is not inconsistent with her earlier statements that the incidents occurred when she was eight or nine, or in second and third grade.
Lande further claims inconsistencies in the evidence as to whether the bedroom door locked, which he claims casts great doubt on the credibility of C.M. and the timing of the alleged incidents. At trial, C.M. testified that Lande called her into her mom's room, locked the door, and made her touch his private part. In her statements at the CAC and Children's Hospital, C.M. also stated defendant locked the door prior to making her touch him.
C.M.'s mother testified her bedroom door would shut but would not lock after Lande kicked in the door. Lande testified the door was broken in January 2001 during a fight between him and C.M.'s mother. He presented several witnesses that stated the bedroom door in question did not have a doorknob. However, one defense witness, Shelby Edwards, who subsequently bought the house at a sheriff's sale, stated he believed there was no doorknob but thought "there was another type of lock on the door, like a latch type or something."
Faced with the above evidence, the jury had to make a credibility determination. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or *291 in part, the testimony of any witness.[24] Where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, this is a matter of the weight of the evidence, not its sufficiency.[25] Furthermore, the credibility of witnesses will not be reweighed on appeal.[26] "The Jackson standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the factfinder at trial."[27] The jury obviously determined C.M. to be credible and believed her testimony that the incidents occurred after Lande married her mother.
Lande also challenges whether the evidence showed he committed indecent behavior with a juvenile, as alleged in count one. Indecent behavior with a juvenile is defined in LSA-R.S. 14:81 as "the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person." Lande argues that C.M.'s testimony labeling things defendant showed her as "porno" or simply stating she saw naked people on television "making out" was insufficient to prove a "lewd or lascivious" act. He contends her testimony fails to establish whether she was watching a XXX-rated movie, an HBO movie, or afternoon soap operas.
"A lewd or lascivious act is one which tends to excite lust and to deprave the morals with respect to sexual relations and which is obscene, indecent, and related to sexual impurity or incontinence carried on in a wanton manner."[28] In State v. Interiano,[29] the Louisiana Supreme Court reaffirmed this definition of "lewd and lascivious" for purposes of LSA-R.S. 14:81(A). The supreme court further noted the Reporter's Comments to LSA-R.S. 14:81(A) and stated lewd and lascivious "encompasses not only the physical touching of the victim in an indecent manner, but also `indecent sexual displays in the presence of children under the age of seventeen.' " "[30] The supreme court stated that it is not necessarily the act in and of itself that has to be lewd and lascivious. It explained that the statute gives notice "that a person knowingly engaged in any overt sexual activity performed in the physical proximity of a child enters a zone of danger in which he runs the risk that a trier of fact may later find that activity criminal in nature."[31]
In determining whether an act is lewd or lascivious, one must consider the time, the place, and all of the circumstances surrounding its commission, including the actual or implied intention of the actor.[32]
In State v. Ellis,[33] the defendant argued that showing to and/or watching with his *292 children, aged six and twelve, the director's version of the R-rated movie "Showgirls" did not constitute a lewd and lascivious act for purposes of committing the offense of indecent behavior with a juvenile. The defendant's daughter testified she watched the movie with her father and that it contained several scenes which depicted women kissing each other "on their tee-tees."[34] She also stated she watched another movie that showed a nude woman standing by a tree. The daughter also testified that during the "Showgirls" movie, the defendant took her hand and rubbed it up and down on his private part. The defendant's son testified he watched the movie "Showgirls," which had nude and lesbian scenes, with the defendant and his sister on more than one occasion while all three were lying in the same bed. The Second Circuit found sufficient evidence to support the defendant's conviction for indecent behavior with a juvenile noting that the evidence showed his wanton conduct was lewd and lascivious.
In the present case, C.M. testified defendant showed her a television show on Channel 52 with naked men and women who were "making out and all that stuff." When asked to clarify, C.M. responded, "[t]hey were having sex." She explained this type of television show was on each time Lande called her to his room and made her touch him. C.M. was again asked what was on television and she responded, "[n]aked people ... having sex." Later during her testimony, C.M. referred to the television show as "porn." She was asked to explain what she meant by "porn" and she responded, "[p]eople having sex." C.M. also testified Lande showed her magazines with women, some of whom were clothed and some of whom were not. While showing C.M. these magazines, Lande commented that the women had big breasts.
On cross-examination, C.M. was asked, "[w]hat is pornography?" and she replied, "[m]en and women ... [h]aving sex." C.M. denied having gone to any movies where women were naked or seeing any other television shows where the girls were naked or partially naked.
We find that this evidence establishes lewd and lascivious behavior. Lande showed C.M. sexually explicit shows immediately prior to making her "rub his private part until white stuff came out." Lande claims C.M.'s description of what she saw on television was not sufficient to establish lewd or lascivious pornographic material. To the contrary, the description of "naked people having sex" effectively conveys material that sufficiently qualifies as an indecent sexual display which tends to deprave the morals in respect to sexual relations. The fact that defendant showed this type of material to a young child prior to physical touching clearly demonstrates wanton conduct.
Viewing the evidence in a light most favorable to the prosecution, we find that there is sufficient evidence for a reasonable jury to convict defendant of both counts of aggravated incest by indecent behavior with a juvenile, count one, and aggravated incest by sexual battery,[35] *293 count four. The evidence shows (1) the acts occurred after defendant married C.M.'s mother thereby establishing the necessary stepparent/child relationship, (2) defendant showed C.M. pornographic material consisting of naked men and women having sex prior to making C.M. touch his private part, which in these circumstances constituted lewd and lascivious behavior, and (3) defendant pulled down his pants and made C.M. "rub his private part until white stuff came out."
In his next assignment, Lande argues the State withheld exculpatory evidence despite his repeated requests for such evidence. He delineates seven items he alleges were Brady[36] material that the State failed to disclose in a timely fashion: (1) the Jefferson Parish Child Sexual Abuse protocol; (2) the existence and contents of three transcripts and audio tapes of interviews with the victims conducted by Dr. Wetsman at Children's Hospital; (3) the existence and contents of Detective McGregor's field notes relating to his first interviews of the victims; (4) the fact the Child Advocacy Center interviewer, Omalee Gordon, wore a one-way ear microphone during her interview of the victims; (5) the existence of undocumented interview sessions by law enforcement with the victims discussing the facts of the case; (6) the fact the victims' biological mother was under investigation for child endangerment or neglect when she gave her statements; and, (7) the facts surrounding the relationship between the victims' biological father's wife and the Kenner Police Department. Lande maintains the State either delayed the production of this evidence or denied its existence only to reveal the evidence at trial in violation of Brady and his due process rights.
In October 2003, Lande filed a motion for bill of particulars seeking information about any exculpatory evidence the State or its witnesses may have. The State gave Lande open file discovery and filed a written response in January 2004 specifically stating that any exculpatory information would be turned over "prior to trial if and when it has any."
Lande pursued various venues for discovery prior to trial. It appears numerous discovery issues were handled between the parties in chambers and were not transcribed. However, the following discovery matters can be gleaned from the record.
Lande sought several subpoenas duces tecum seeking information from Omalee Gordon at the Children's Advocacy Center, Drs. Scott Benton and Ellie Wetsman at Children's Hospital, and the victims' schools. Defendant specifically requested, among other things, audio and video tapes relating to the examination of each victim pursuant to a criminal investigation and protocols or written procedures for conducting forensic examination of child sexual abuse victims. The State filed motions to quash the subpoenas which were essentially denied after hearings held on November 10, 2004 and December 8, 2004. Thereafter, on February 17, 2005, the record shows the State requested and was granted the issuance of a subpoena duces tecum to Children's Hospital for the audiotaped statements of the victims given to Dr. Ellie Wetsman.
The audiotapes of Dr. Wetsman's interviews with the victims were given to Lande on the first day of trial. On the *294 morning of trial, the State indicated it was in the process of copying the audio-taped interviews of the victims conducted by Dr. Wetsman and would immediately give defendant the copies and transcripts upon receipt. The State explained the medical records, presumably already in defendant's possession, showed a summary of what was stated on the audiotapes and noted there were no inconsistencies. It appears that, during this discussion, the copies of the audiotapes were given to the defense. These audiotapes were used by the State on the third day of trial during the testimony of Dr. Wetsman.
Before the jury was empaneled, the State provided the defense with Detective McGregor's notes of the victims' initial disclosure, which consisted of one letter-size page. The prosecutor explained he had only received the notes the day before. Defense counsel complained that he had asked for the notes "a long time ago" and proceeded to argue the impact the notes made on previously requested information pertaining to the sexual abuse case involving the victims' stepsister, F.S., to which he was denied access.[37] Defense counsel maintained Detective McGregor was the same officer who handled the investigation into the sexual abuse of F.S. He contended that, because the victims did not allege abuse until after Detective McGregor investigated F.S.'s allegations of abuse, the revelation of Detective McGregor's notes somehow made the records pertaining of F.S.'s case more compelling. The trial court asked the State to provide a copy of Detective McGregor's summary of the investigation into F.S.'s sexual abuse case if it existed and agreed to conduct an in-camera inspection. The record does not show that this matter was ever revisited during trial. Nonetheless, these notes were admitted into evidence during the testimony of Detective McGregor over defense counsel's objection.
The existence of the protocol was revealed during the testimony of the State's first witness, Detective Brian McGregor. During his testimony, Detective McGregor referenced a protocol that dictates how a complaint of child sexual abuse is investigated. Defense counsel objected to testimony pertaining to the protocol on the basis he had specifically asked for the protocol in discovery and had been told it did not exist. The trial judge noted defendant's objection and the trial proceeded.
During Detective McGregor's explanation of the protocol and the interview process, defendant learned that the police communicated with the CAC interviewer, Omalee Gordon, during the interview process. Specifically, Detective McGregor stated he was present in a separate room during the victims' interview at the CAC and explained that Ms. Gordon wore an ear piece that allowed the detectives to relay to Ms. Gordon questions they would like asked. Detective McGregor explained Ms. Gordon ultimately decided if the question was appropriate and how the question would be asked if at all. Defense counsel lodged another objection stating he was just then learning of an inter-relationship between the police and the CAC regarding the child abuse interview process despite having asked for the protocol well in advance of trial. Direct examination continued but no further questions about the protocol were asked. On cross-examination, defense counsel questioned Detective McGregor about the protocol, the interview process of the victims, and the investigation procedure.
*295 Lande also complains of the undisclosed facts pertaining to the relationship between the victims' stepmother and the Kenner Police Department, the investigation of the victims' mother by child protection services, and the existence of unrecorded interviews between the police and the victims, all of which were revealed through the testimony of various witnesses during the course of the trial.
The relationship between the victims' stepmother and the Kenner Police Department was known to defense counsel prior to trial as evidenced by his questioning of Detective McGregor on cross-examination. Defense counsel's first question to Detective McGregor related to his previous contact with the victims' stepmother. Detective McGregor testified he was acquainted with her ex-husband who was a member of the Kenner Police Department. He further stated he first met the victims' stepmother after receiving a phone call from the ex-husband about the possible sexual abuse of their daughter, F.S.
The next issue defense counsel pursued on cross-examination of Detective McGregor was his interview of the victims' biological mother. Detective McGregor responded he first advised her of her rights because there was an issue she was present during the abuse and there were some allegations of drug abuse made during the interview of the victims. Defense counsel immediately objected, stating he was told prior to trial that the victims' mother was never a suspect and was not under investigation. He specifically stated he asked for information of whether the victims' mother was ever charged or accused of a crime. He claimed the information was relevant in his defense that the victims' mother's statement was coerced and given under the threat of prosecution. The trial judge noted that the mother was never charged or accused and overruled the objection.
The unrecorded interviews appear to be the contact Omalee Gordon had with the victims prior to the CAC recorded interviews. Detective McGregor testified that Omalee Gordon meets with the child victim prior to the recorded interview to see if the child is going to give an interview and to instruct the child about the interview process. Ms. Gordon was asked to elaborate on the "pre-interview" process during her cross-examination by defense counsel. She explained the purpose of the "pre-interview" was to establish a rapport with the child.
Lande urges this Court to look at the cumulative effect of the above late and non-disclosures as opposed to reviewing each piece of evidence individually. Lande contends the multitude of late disclosures as a whole demonstrates he was ambushed at trial and, thus, did not receive a fair trial.
In Brady v. Maryland,[38] the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Favorable evidence includes both exculpatory evidence and evidence that impeaches the testimony of a witness whose credibility or reliability may determine guilt or innocence.[39]
*296 Evidence is material only if there is a reasonable probability that the results of the proceeding would have been different if the evidence had been disclosed to the defense. A "reasonable probability" is that which is sufficient to undermine confidence in the outcome of the trial.[40] In determining materiality, a reviewing court must ascertain "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[41]
The United States Supreme Court has explained that "[t]there are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[42]
In Kyles v. Whitley,[43] the United States Supreme Court made clear that materiality is not determined item by item but by the cumulation of the suppressed evidence. Thus, even if each item by itself would not warrant a new trial, the accumulation may.
"Late disclosure as well as non-disclosure of evidence favorable to the defendant requires reversal if it has significantly impacted the defendant's opportunity to present the material effectively in its case and compromised the fundamental fairness of the trial."[44] The impact on the defense of late disclosure of favorable evidence must be evaluated in the context of the entire record.[45]
Lande complains of seven pieces of evidence that he asserts constituted Brady material but were either not disclosed by the State or untimely disclosed. As stated above, there are three components of a Brady violation: 1) the evidence must be exculpatory; 2) the evidence must have been suppressed; and, 3) the defendant must have been prejudiced.
Three of the items of which defendant complains are tangible: the audiotapes from Children's Hospital, the protocol, and Detective McGregor's notes. None of these three items were exculpatory or had impeachment value. Exculpatory evidence by definition is that "which tends to justify, excuse or clear the defendant from alleged fault or guilt."[46] Nothing in the audiotapes, the protocol, or the notes tended to clear defendant from guilt.
Further, none of the items had impeachment value. The audiotapes from Dr. Wetsman's interview of the victims at Children's Hospital did not contain any information that could have been used to impeach the credibility of any witness. The audiotapes were consistent with the medical *297 reports prepared by Dr. Wetsman regarding her examination of the victims and did not contradict the testimonies of Dr. Wetsman or the victims. Likewise, Detective McGregor's notes from the victims' initial disclosure were consistent with his testimony and that of the victims and, thus, had no impeachment value. The protocol merely set forth Jefferson Parish's general procedure for investigating child abuse cases and contained no information that could have been used to impeach the credibility of any witness. Accordingly, we find that these three items fail the required components for a Brady violation.
Additionally, the fact that Omalee Gordon wore an ear piece during her interview of the victims had no impeachment value. Detective McGregor testified about the earpiece and Omalee Gordon admitted the existence of the ear piece when questioned by defense counsel on cross-examination. The fact defendant contends the ear-piece somehow affected Ms. Gordon's credibility does not make it impeachment material. The record shows both Detective McGregor and Ms. Gordon stated Ms. Gordon determined what questions were asked to the victims. The fact the police can communicate with Ms. Gordon during the interview process does not tend to discredit Ms. Gordon or show that she is biased.
As for the remaining three items, it is questionable whether they are even "discoverable evidence." Lande asserts the State failed to inform him of the existence of a relationship between the victims' stepmother and the Kenner Police Department via her previous marriage to a Kenner police officer and because of the report of her own daughter's sexual abuse that was investigated by Detective McGregor, who also investigated the present victims' allegations. This information does not appear to be material that can be "produced" by the State.
Notwithstanding, Lande has failed to show how this relationship was impeachment evidence. He appears to suggest the relationship reduces the credibility of Detective McGregor and/or the victims' stepmother. The fact this relationship may or may not show bias or affect the credibility of Detective McGregor or the victims' stepmother does not throw it into the realm of Brady material. Nothing in the record suggests Detective McGregor was biased in his investigation into the victims' allegations.
The fact the victims' mother was under investigation for child endangerment and/or child neglect at the time she gave her statement to the police was not impeachment evidence. Defendant claims the victims' mother was coerced into giving the statement under threat of prosecution for child endangerment or neglect. However, the victims' mother testified at trial and stated she had no fear that she was under investigation for child neglect when she gave her statement in June 2003. She explained that she received a letter from child protection services asking whether she was home when the incidents occurred but stated she was not upset by the letter. Additionally, as noted by the trial judge, the record reflects the victims' mother was never accused or charged with any crime.
Finally, the existence of unrecorded interviews was not impeachment evidence. Omalee Gordon testified that she met with the victims prior to the taped interview to establish a rapport with the children and to explain the interview process. There was no evidence the facts of the case were discussed in this "unrecorded interview" or that the discussion affected the credibility of any of the victims or witnesses or yielded any information that was inconsistent with any of the evidence *298 or testimony at trial. The mere existence of a fact unknown to a defendant does not qualify that fact as impeachment evidence.
Moving to the last prong of the Brady violation test, there is no indication defendant was prejudiced by the late or non-disclosure of the above evidence.[47]
Despite Lande's claim he was ambushed at trial by Brady violations, the record shows he effectively presented his defense and strategically incorporated the above evidence during the five days of trial. The record shows defendant's expert witness, Dr. David Clark, had the opportunity to review the audiotapes from Children's Hospital prior to his testimony on the fifth day of trial. Defense counsel used the protocol throughout the trial to question various witnesses. Although he did not cross-examine Detective McGregor specifically about the protocol, he used it on the second day of trial to cross-examine Detective Herbert Hille, who prepared the initial and investigative report. Detective Hille testified he was familiar with the protocol stating it set forth the standard procedure for handling cases involving child abuse cases. Defense counsel then questioned Detective Hille about the "interview team," which was mentioned in the protocol, and the inter-relationship between the police, the Office of Community Services, the CAC, and the District Attorney's office.
Defense counsel also questioned Dr. Ellie Wetsman about the protocol on the third day of trial. Dr. Wetsman testified she was unaware of the Jefferson Parish protocol and stated she had no knowledge about Children's Hospital being an agent of the coroner's office as stated in the protocol. It appears defense counsel strategically did not inquire about the protocol with Omalee Gordon or his own expert, Dr. Clark, who did not testify until the last day of trial.
Additionally, defense counsel was the one who elicited and explored the existence of the relationship between the victims' stepmother and a Kenner Police Department police officer thereby showing he had prior knowledge of this fact prior to trial. Defense counsel's prior knowledge of this relationship was also evidenced in his writ application dated June 14, 2004, which was well in advance of trial.
Further, defense counsel thoroughly questioned the victims' mother about whether she feared prosecution when she gave the statement to the police.
A review of the entire record makes it clear the alleged untimely disclosure of the above evidence did not impair defendant's ability to present his defense and, therefore, did not prejudice him. The effectiveness of defendant's defense is further demonstrated by his acquittal on three of the five counts.
In summary, we find that the delayed disclosures or non-disclosures of the above evidence did not constitute Brady violations.
In his third assignment of error, Lande argues this Court erred in granting a writ that overruled the trial court's ruling to allow certain responsive verdicts to aggravated incest. He claims the jury should have been charged with lesser and included grades of the offense including those underlying offenses contained within LSA-R.S. 14:78.1, such as sexual battery and indecent behavior with a juvenile. Lande asserts these are lesser and included grades of the offense because the State must prove every element of the underlying offense before proving the aggravating condition. He maintains a person could be guilty of sexual battery but not necessarily *299 aggravated incest by sexual battery. Defendant alleges he was prejudiced by this Court's action striking the proposed responsive verdicts because there was a likelihood the jury would have returned verdicts for a lesser charge had they been properly charged since he was acquitted of three of the five counts.
Under the discretionary principle of "law of the case," an appellate court will generally not reconsider prior rulings made in the same case on subsequent appeal.[48] Reconsideration of a prior ruling is warranted when, in light of a subsequent trial court record, it is apparent that the determination was patently erroneous and produced unjust results.[49] Although Lande did not file a response to the State's writ application, defendant fails to present any new evidence to show that this Court's prior disposition was patently erroneous. Therefore, under law of the case, we are not required to address the issue.[50]
In his fifth assignment of error, Lande contends that this Court erred in two of its pre-trial writ rulings and urges this Court to reconsider the issues. First, defendant asserts the trial court and this Court erred in denying his expert the opportunity to interview the victims prior to trial. Second, defendant maintains this Court erred in reversing the trial court and denying his expert the opportunity to review the videotapes of the CAC interviews with the victims.
Lande has neither offered any new arguments or jurisprudence that suggests this Court's prior rulings on these two issues are erroneous nor has he cited any evidence presented at trial that would change these rulings. Thus, under law of the case, discussed, supra, in assignment of error number three, we will decline to reconsider the issues.
In Lande's sixth assignment of error he asserts that he was denied due process of law his rights under the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and Article 1, Sections 13 and 16 of the Louisiana State Constitution of 1974 when the trial court failed to grant him access to the criminal court record of the alleged victim's stepsister and when this Court failed to grant a writ of review.
By this assignment of error, Lande reurges an issue raised in his previous writ application, No. 04-K-685, which was denied by this Court. Lande admits his argument has not changed since the writ application but notes that the evidence at trial confirmed all his stated reasons for needing access to the criminal court record of a sexual abuse case involving C.M.'s stepsister, F.S. Lande incorporates his writ application as his argument but does not specify or explain what evidence at trial supports his argument.
As stated in assignment of error number one, Lande was given open file discovery. A few months later and after the State filed written responses to the motion for bill of particulars at defendant's request, defendant filed a motion for an in-camera examination of potential Brady material. In his motion, Lande stated outstanding discovery issues had been previously addressed *300 at a pre-trial conference in chambers and all parties agreed to resolve the issues through an in-camera inspection. Lande outlined the discovery he sought, which consisted of any investigation into the victims' mother and all information relating to the alleged sexual abuse of the victims' stepsister, F.S. The trial court held a hearing on the motion and took the matter under advisement.
On May 11, 2004, the trial court issued an order finding Lande was not entitled to information relating to the sexual abuse of F.S. because the information sought did not contain any Brady material. The trial court explained the sexual abuse of F.S. was different than the present allegations of sexual abuse and involved a different pattern of abuse. Defendant sought a writ of review from this Court, which was denied in a disposition stating, "On the showing made we find no reason to exercise our supervisory jurisdiction."[51]
In his writ application, Lande argued the trial court erred in ruling information pertaining to the sexual abuse of F.S., contained in a police report, was not exculpatory. Defendant maintained the sexual abuse of the victims' stepsister exposed the victims to the idea of sexual abuse and was a catalyst in the victims' fabrication of allegations of sexual abuse against him. Defendant further asserted the information was important because the same detective who investigated the stepsister's allegations of sexual abuse also investigated the victims' allegations of abuse. Lande alleged that, without the police report containing the stepsister's allegations of sexual abuse, he would be unable to show the jury that the victims had concocted the allegations after being exposed to the idea of sexual abuse in an effort to please their father and/or punish defendant for doing drugs with their mother.
The law pertaining to Brady evidence was set forth supra in assignment of error number one. The trial court reviewed the police report in camera and determined it did not contain Brady material. A copy of the police report at issue was attached to the writ application and is not contained in the appellate record. There is no indication defendant requested the police report be sealed so that it could be submitted to this Court for review. Thus, we cannot independently review the document at issue to determine whether it contains Brady material.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux,[52] and State v. Weiland[53] The following matter is noted:
The record does not reflect that defendant was notified of the sex offender registration requirements. Defendant's conviction is defined as a sex offense by LSA-R.S. 15:541(14.1). LSA-R.S. 15:540, et seq. requires registration of sex offenders. Further, LSA-R.S. 15:543(A) requires the court to notify a defendant of the registration requirements as follows: "The court shall provide written notification to any defendant charged with a sex offense of the registration requirements of R.S. 15:542. Such notice shall be included on any guilty plea forms and judgment and sentence forms provided to the defendant."
This Court has held that the trial court's failure to provide this notification constitutes an error patent and warrants a *301 remand for written notification.[54] Thus, we order the trial court to inform defendant of the registration requirements of LSA-R.S. 15:543(A) by sending written notice to the defendant within ten days of this Court's opinion and to file written proof in the record that defendant received the notice.[55]
Accordingly, for the foregoing reasons, the defendant's conviction is affirmed, and we remand with instructions.
AFFIRMED; REMANDED.
NOTES
[1] The children ranged in age from twelve to fifteen at the time of trial. Their initials are used under the authority of LSA-R.S. 46:1844(W)(3), which allows the court to identify a crime victim who is a minor or a victim of a sex offense by using his or her initials.
[2] Defendant's assignments of error are addressed out of order so that the sufficiency of the evidence is addressed prior to any issues relating to trial court errors. In State v. Hearold, 603 So.2d 731, 734 (La.1992), the Louisiana Supreme Court stated that, when the issues on appeal relate to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. Because defendant raises the constitutionality of the statute under which he was convicted, it is addressed first since sufficiency of the evidence presumes the validity of the statute establishing the offense.
[3] U.S. Const. amend. XIV, § 1; La. Const. art. I, §§ 2, 13; State v. Bentley, 96-795 (La. App. 5 Cir. 3/25/97), 692 So.2d 1207, 1209.
[4] State v. Hart, 96-599 (La.1/14/97), 687 So.2d 94, 95.
[5] State v. Bentley, supra, at 1209.
[6] State v. Hair, 00-2694 (La.5/15/01), 784 So.2d 1269, 1274.
[7] State v. Brown, 03-2788 (La.7/6/04), 879 So.2d 1276, 1280, cert. denied, 543 U.S. 1177, 125 S.Ct. 1310, 161 L.Ed.2d 161 (2005).
[8] Id.
[9] Id. (Internal citations omitted.)
[10] LSA-R.S. 14:3.
[11] State v. Bentley, 692 So.2d at 1209-10.
[12] State v. Hair, 784 So.2d at 1274.
[13] 28,834 (La.App. 2 Cir. 12/11/96), 684 So.2d 1075.
[14] State v. Whitt, 684 So.2d at 1077.
[15] Aggravated battery is defined as a battery committed with a dangerous weapon. LSA-R.S. 14:34. The court reasoned that, in order to obtain a conviction for aggravated battery, the legislature clearly intended for the State to prove each element of a battery, included in LSA-R.S. 14:33, and, in addition, prove the offender used a dangerous weapon.

The Second Circuit also noted that the basic offense of battery does not impose a punishment but, rather, it is the statutes setting forth the degrees of battery, such as aggravated battery, that impose the punishment. To the contrary, the basic offense of incest imposes its own punishment based on the degree of the consanguineous relationship, with the closer relationships carrying the higher penalty. LSA-R.S. 14:78(D).
[16] The court explained that aggravated crime against nature is defined as a crime against nature, which is the "basic" offense, committed under the special circumstances outlined in the statute, LSA-R.S. 14:89.1.
[17] State v. Whitt, supra, at 1077.
[18] It is noted that defendant moved for a directed verdict at the conclusion of the State's case. A motion for a judgment of acquittal is properly made only when the case is tried before a judge alone. A defendant is not entitled to a directed verdict of acquittal in a jury trial. LSA-C.Cr.P. art. 778; State v. Allen, 440 So.2d 1330, 1331 (La.1983); State v. Boudreaux, 526 So.2d 230, 234 (La.App. 5 Cir.1988), writ denied, 532 So.2d 176 (La. 1988). The proper procedural vehicle for raising the issue of the sufficiency of the evidence is a motion for post-verdict judgment of acquittal. LSA-C.Cr.P. art. 821; State v. Allen, supra. However, the failure to file a motion for post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982); State v. Carey, 04-1073 (La.App. 5 Cir. 3/29/05), 901 So.2d 509, 512, fn. 4.
[19] Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).
[20] State v. Bolden, 03-0266 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1056.
[21] State v. Hawkins, 99-217 (La.App. 5 Cir. 7/2/99), 740 So.2d 768, 769.
[22] State v. Ruffin, 02-798 (La.App. 5 Cir. 12/30/02), 836 So.2d 625, 630, writ denied, 03-3473 (La.12/10/04), 888 So.2d 831.
[23] LSA-R.S. 14:78.1(A).
[24] State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
[25] State v. Bolden, 03-0266 (La.App. 5 Cir. 7/29/03), 852 So.2d 1050, 1057.
[26] State v. Rowan, supra.
[27] State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291, 1293.
[28] State v. Stec, 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787, citing State v. Holstead, 354 So.2d 493, 497-498 (La.1977).
[29] 03-1760 (La.2/13/04), 868 So.2d 9, 15.
[30] Id. at 15.
[31] Id. at 15.
[32] State v. Sturdivant, 27,680 (La.App. 2 Cir. 2/28/96), 669 So.2d 654, 658.
[33] 38,740 (La.App. 2 Cir. 8/18/04), 880 So.2d 214.
[34] State v. Ellis, 880 So.2d at 220.
[35] Sexual battery is defined in LSA-R.S. 14:43.1 as

the intentional engaging in any of the following acts with another person where the offender acts without the consent of the victim, or where the act is consensual but the other person ... has not yet attained fifteen years of age and is at least three years younger than the offender:
....
(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.
Defendant does not challenge the sufficiency of the evidence in proving the elements of sexual battery but only challenges the stepparent/child relationship required for the act of sexual battery to constitute aggravated incest.
[36] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[37] Defendant raises the issue of his denial of access to information relating to F.S.'s sexual abuse case, infra, in assignment of error number six.
[38] 373 U.S. 83, 83 S.Ct. 1194, 1196-1197, 10 L.Ed.2d 215 (1963).
[39] In re Jordan, 04-2397 (La.6/29/05), 913 So.2d 775, 782, citing Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); State v. Calloway, 97-796 (La.App. 5 Cir. 8/25/98), 718 So.2d 559, 562, writs denied, 98-2435 and 98-2438 (La.1/8/99), 734 So.2d 1229, citing United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
[40] State v. Johnson, 05-180 (La.App. 5 Cir. 11/29/05), 917 So.2d 576, 579, citing United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
[41] State v. Johnson, supra, citing Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
[42] Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); State v. Louviere, 00-2085 (La.9/4/02), 833 So.2d 885, 896, cert. denied, 540 U.S. 828, 124 S.Ct. 56, 157 L.Ed.2d 52 (2003).
[43] Kyles v. Whitley, 115 S.Ct. at 1567.
[44] State v. Harris, 01-2730 (La.1/19/05), 892 So.2d 1238, 1250, cert. denied, ___ U.S. ___, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005).
[45] Id.
[46] Black's Law Dictionary, Sixth Edition.
[47] Kyles v. Whitley, 115 S.Ct. at 1555.
[48] State v. Jacobs, 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, 88.
[49] State v. Jacobs, supra, involved review of a writ denial. The same principles of law apply to the review of a granted writ. See, State v. Burciaga, 05-357 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, where this Court noted the discretionary principle of "law of the case" and chose to reconsider its prior ruling of granting a writ that involved a motion to suppress.
[50] State v. Jacobs, 04-1219 (La.App. 5 Cir. 5/31/05), 904 So.2d 82, 88.
[51] Because this Court clearly did not rule on the merits of the writ application, the theory of law of the case is inapplicable.
[52] 312 So.2d 337 (La.1975).
[53] 556 So.2d 175 (La.App. 5 Cir.1990).
[54] See, State v. Stevenson, 00-1296 (La.App. 5 Cir. 1/30/01), 778 So.2d 1165, 1166-67.
[55] Id.