ROBERT M. MURPHY, Judge.
12Pefendant, Rolando Vargas, appeals his conviction for attempted simple rape, a violation of La. R.S. 14:43 and 14:27, on the basis of insufficiency of the evidence. For the following reasons, we affirm defendant’s conviction and sentence and remand for correction of an error patent as noted herein.

PROCEDURAL HISTORY

On August 24, 2012, the District Attorney for the Parish of Jefferson filed a bill of information that charged defendant, Rolando Vargas, with one count of simple rape, in violation of La. R.S. 14:43. Defendant pled not guilty on September 20, 2012. Trial commenced on February 21, 2013, and on February 22, 2013, defendant was found guilty by a jury of the lesser responsive offense of attempted simple rape. On March 11, 2013, defendant was sentenced to seven years at hard labor with credit for time served, without the benefit of parole, probation, or suspension of sentence. Defendant was also ordered to register as a sex offender pursuant to La. R.S. 15:543.1. On March 25, 2013, defendant timely piled a notice of intent to appeal, which was granted by the trial court on March 27, 2013. The instant appeal follows.

FACTS

The trial commenced on February 21, 2013. Candice Hovell, Jeff Dodson, Emily Ratliff, Bernardo Munoz, and the victim, D.V.,[1] each testified that they were all part of a group[2] which drove in a single vehicle from Alabama to the New Orleans metro *752 politan area in March- of 2011, for Mardi Gras. They arrived in Jefferson Parish in the evening hours of Friday, March 4, 2011. During their stay, the group of six shared a single room at the Comfort Inn Suites in Kenner.
After checking in on Friday night, the group went to the French Quarter in New Orleans, where they stayed for several hours. Upon returning to the hotel, some members of their party went to sleep while Emily Ratliff and Jeff Dodson went to the hotel’s pool and hot tub area. While by the pool, they met two Hispanic men. The men offered Emily a beer from their cooler, and she spoke to them for a short while. She learned that the men were cousins from Texas and had also traveled to see Mardi Gras. They also told Emily where their hotel room was located and invited Emily and her boyfriend for drinks which they declined.
On the night of Saturday, March 5, 2011, everyone in the group went back to the French Quarter where several of them, including the victim and her boyfriend Bernardo Munoz, became heavily intoxicated. Upon returning to the hotel in the early morning hours on Sunday, March 6, 2011, Candice and Dan went to the room to sleep, while Emily, Jeff, D.Y., and Bernardo continued to drink.
Jeff testified that he and the three others in his group arrived at the hotel pool area at approximately 4:00 a.m., and they were there for an hour in the jacuzzi. He [4noted that during that time, the victim was passed out, her feet barely touching the water, while Bernardo was sitting next to her vomiting.
After Bernardo got sick, Jeff described how he and Emily went to the hotel buffet to get Bernardo some water, as well as food for themselves. When Jeff and Emily left, the victim and Bernardo remained near the hot tub in the condition previously described. Ten minutes later, Jeff returned to the pool area to check on Bernardo. Jeff described how someone temporarily held the pool door closed, and he heard something yelled which he did not understand. The door opened quickly, and Jeff saw the victim with her legs underwater wrapped around a man and her top removed. Jeff testified he could not tell if the victim was still wearing her bikini bottom.
Per Jeffs testimony, Jeff alerted Bernardo that the victim was being assaulted. The man, who was in the hot tub with the victim, then pulled up his pants as he got out of the water with a visible erection. That man and another man then left the scene. Jeff went to the front desk and asked the hotel clerk to call 911. The police arrived and went upstairs to the group’s room; they were then directed to defendant’s room. The location of the room was known to Emily because the men staying in the other room had spoken to Emily the night before.
The State played Exhibit 3-N for Jeff, which was video footage of the pool area at the time of the assault. Jeff identified three men who were in the pool area when he left to go to the buffet. Jeff identified himself trying repeatedly to open the pool door before finally getting in. He said that the man pulling the door closed yelled something, but he did not know what was said. The video also showed the man who had held the door closed as well as the man who was with the victim in the hot tub, leaving the area.
| fiLater that summer, Jeff was sent a photographic lineup by detectives; he testified that he was unable to make an identification.
On cross-examination, Jeff explained that the man in the hot tub -with the victim got out quickly. The man got into an *753 elevator across the hallway. The suspect did not exit through the front door of the hotel, or jump the fence into the parking lot.
Emily testified that she, the victim, and their boyfriends brought alcohol down to the pool area. They sat around the hot tub with their feet in the water. The victim was intoxicated and passed out on the edge of the hot tub with her feet in the water. When Bernardo started throwing up, Emily and her boyfriend went to get some water for him from the hotel breakfast area. Emily testified that at the time they left, no one else was in the pool area. The two were gone for approximately five minutes and Jeff returned to check on the victim and Bernardo. She continued that she remembered seeing Jeff coming back down the hallway saying that the victim had just been raped. Emily went to check on the victim, who was still there. She testified that she did not see anyone else with the victim at that time. She tried to interact with the victim who was “out of it” but still in the water. Emily noted that although the victim had been clothed when Emily had left minutes before, the victim did not have her swim suit bottom on when Emily returned. She found them about four feet away.
It was approximately 5:30 a.m., and the hotel lobby was busy. Jeff went upstairs to alert Candice and Dan. Candice called the police, who arrived quickly. The victim was brought upstairs. When Emily spoke to the police, she told them about the people she and her boyfriend had met the night before and gave a description as well as the location of the room where the men were staying. She followed the police to the men’s room and recognized one of the cousins. Emily ^testified that she talked to him, and he indicated that his cousin had left to return to work in Texas. This occurred 30 minutes after the alleged incident had occurred.
Later that summer, police presented Emily with a photo lineup. She testified at trial that she was able to identify one of the men from the pool and wrote on the back of the document.[3] A detective also wrote on the back of the document that, “[Emily] Ratliff states she’s 95 percent sure Number Five is the suspect; 100 percent sure that 1, 2, 3, 4, and 6 are not the suspect.” At trial, Emily viewed video footage taken at the hotel and identified one of the men who had previously invited her and her boyfriend to come to their hotel room. Emily said that the victim was “very intoxicated” after the incident and confused about what was happening.
Bernardo testified he, the victim, Jeff and Emily decided to go downstairs to drink and go to the pool. Bernardo testified that when he awoke, he saw the victim with her bikini bottom off with a naked man holding her legs up. The man noticed Bernardo awake, then “scurried out.” Bernardo testified that he had passed out but that when he woke up, there was a man at the door and another man he identified in court, as well as the victim. He does not know what woke him up. Bernardo testified that the man touching the victim was approximately three to four feet away from him. Bernardo testified that he did not remove the victim’s bikini bottom, and she was wearing it before he passed out. He further testified that he did not see defendant penetrate the victim; defendant’s erect penis, however, was less than a foot from the victim’s body. After defendant left, Bernardo got the victim from the hot tub and others in the group helped to get the victim dressed before they brought her upstairs to the room. The victim was not responsive. At the *754 hotel, Bernardo never again saw the man who had touched the victim; however, 17he testified that he did see the other man who was by the hot tub standing down the hall in front of his room.
On cross-examination, Bernardo reiterated that he did not see the victim sexually penetrated in any manner.
The victim, D.Y., testified that her group had remained on Bourbon Street drinking alcohol “until fairly late.” Upon returning to the hotel on the second night, she, Bernardo, Emily and Jeff kept drinking and also went outside to smoke marijuana. Eventually, D.V. and her friends changed into their bathing suits to go sit by the indoor jacuzzi. Her next recollection is waking up in the hospital, where she was examined. She was unable to answer the detective’s questions because she did not recall anything. Specifically, she testified she did not recall getting into the hot tub, or taking off her bathing suit, or having consensual sex with someone.
Candice Hovell testified that she was the person who called 911 after the incident took place.[4] The call was initially made from the lobby area on the first floor, but she went back to the room to comfort the victim along with the others in her group. Candice described the victim to the 911 operator as being “incapacitated.” Candice attempted to get the victim to sit up but was unsuccessful. The victim also did not appear to recognize her. She, along with Bernardo, took the victim to the hospital.
State’s Exhibit 3-N, consisting of video surveillance footage from the hotel, was played for the jury, and showed Candice calling 911 while Dan carried the victim in his arms. The victim’s boyfriend was intoxicated. Candice stated that she was not aware of what had taken place prior to the time that she was awakened.
Officer Immanuel Cohen testified that he worked patrol for the Kenner Police Department and was serving in that capacity on March 6, 2011, when he | ^responded to a call of a possible sexual assault at the Comfort Inn Suites. When he arrived at the hotel at approximately 5:25 a.m., he observed Jeffrey, his girlfriend, and Bernardo screaming that their friend had been raped. Cohen checked on the condition of the victim, who was “extremely intoxicated, disoriented, didn’t know where she was at.”[5] Cohen was directed to the room where defendant had been staying, but defendant was no longer there. He did not see defendant at all in the hotel that morning.
Officer Cohen was in charge of the initial investigation, which was then turned over to Detective Adams.[6] Adams received Cohen’s report, which included interviews with Jeffrey, Emily, Bernardo and the victim. When Cohen first encountered the victim, she was alone in her hotel room on the bed in a disoriented and intoxicated state. The victim did not indicate to Cohen that she required medical attention.
In his report, Cohen wrote that he was advised that the victim and the persons she was with, had all arrived at the hotel at approximately 4:00 a.m. When Cohen spoke with Bernardo, the victim’s boyfriend, Bernardo indicated that he and the victim were sitting with their legs inside of the jacuzzi, and he passed out due to intox *755 ication and later vomited in the immediate area. Bernardo knew which room defendant was in and said he could identify him. Cohen did not think that the persons he interviewed knew the exact time that the assault took place, although Jeff confirmed that “[t]hey were drinking sometime between 4:00 and the 5:24 [call].” Jeff reported that he and Emily left the pool area to get breakfast, leaving Bernardo and the victim alone in the pool room. Jeff said that he returned to the pool area five minutes later, and there was a brief struggle with the door. When |9the door opened, Jeff saw defendant submerged in the jacuzzi. Juan Uribe[7] told Cohen that defendant had left the scene and gone to Houston, Texas.
Deputy Jennifer Trigueros testified that she was formerly employed by the Kenner Police Department as a Crime Scene Technician. On March 6, 2011, she was asked to help investigate a scene of a potential sexual assault at a Comfort Inn Suites. In connection with the investigation, she prepared a Chain of Custody form and also took photographs at the scene.[8] The pictures consisted of the pool area of the hotel, the jacuzzi, vinyl seating next to the jacuzzi, and a lounge chair. The photos were concentrated on the area of the alleged sexual assault. Trigueros also collected towels and sheets that could have contained biological evidence.[9]
After leaving the hotel, Trigueros went to Lakeside/Tulane Hospital to collect evidence from a nurse, which included a Sex Crimes Kit. She then returned to the hotel where she and Detective Adams first met with the hotel manager then collected video from the hotel’s camera systems.[10] Trigueros did not alter the video in any way. She did not do any other work in connection with the case.
Doctor Janifer Tropez-Martin, tendered without objection as an expert in the field of obstetrics and gynecology, testified that she performs rape assessments for the Jefferson Parish Coroner’s Office. On March 6, 2011, Dr. Tropez-Martin examined the victim in this matter.[11] The general process for administering the “Rape Kit” to obtain samples was described. She recalled that the specific complaint she received from the victim was that she had been raped, although the victim could not recall any information. When asked about potential sex acts that may have occurred to the victim, the victim replied to all questions that she was |in“unsure.” A physical exam was conducted of the victim and, other than a bruise to the left side of her neck and two bruises on her legs, her pelvic exam was “completely normal.” Dr. Tropez-Martin opined, however, that an absence of injuries does not mean no sexual intercourse occurred. She could not say definitively, based on her examination of the victim, whether there had been sexual contact. In her opinion, the fact that sex may have occurred near a pool would affect the ability to recover samples or organic material off the victim because of the presence of chlorine, which kills free-floating cells. Dr. Tropez-Martin estimated that in the majority of rape cases that she *756 conducted, alcohol was involved. She was not made aware of the results of the Rape Kit.
Adriana Perez was admitted without objection as an expert in the field of DNA forensic analysis employed by the Jefferson Parish Sheriffs Office.[12] In connection with this case, Perez examined a Personal Evidence Recovery Kit and various items of clothing, including a bikini top and bottom and a pair of shorts. All items were tested for the presence of seminal fluid. No DNA was found on any of the items.
Gaudalupe Vargas testified that he is a welding inspector from Houston who was employed by Fugro Consultants in 2011. Defendant, Rolando Vargas, is his cousin, whom he identified in court. Juan Uribe[13] and defendant are cousins as well. Gau-dalupe was working in Kenner in March of 2011 during Mardi Gras. Gaudalupe was staying at the Comfort Inn Suites, paid for by his employer, during his four or five month assignment inspecting levees. He was also driving a truck provided by the company. Gaudalupe contacted his cousins, Carlos and Rolando, in Houston, Texas, and invited them to come stay with him. The two arrived in|ntown at approximately 10:00 p.m., and the three went to the French Quarter that night, where they drank before returning to the hotel at approximately 4:00 or 5:00 a.m. Gaudalupe and Carlos went down to the pool where they met and had a conversation with a group of people from Alabama. Gaudal-upe testified that he did not invite them to “come back and party” with him and his cousins.
Gaudalupe recounted that on Saturday night, he and his cousins went back to the French Quarter, drank, and returned to their hotel at approximately 4:00 or 4:30 a.m. They went to their room and then decided to go to the pool area. Defendant jumped into the pool. There were only two other people in the pool area at the time, a male and a female who were by the hot tub. Gaudalupe recalled that the couple was sitting down, but he did not speak to them. Gaudalupe stated that after five or ten minutes, he went to the restroom then returned upstairs while defendant and Carlos remained in the pool area. Gaudalupe recalled that one of his cousins jumped into the pool in his underwear. Gaudalupe looked one last time before going upstairs, and he could see that his cousins were there “standing around.” Shortly after going upstairs, Gaudalupe testified that his cousins joined him. Defendant said that he had to work on Sunday but said nothing else before leaving 15 minutes later. Gaudalupe did not recall what defendant was wearing at the time. Soon after, the police showed up at Gau-dalupe’s door.
Defendant and Carlos drove from Houston in separate vehicles. A total of four people drove in from Houston and were staying in Gaudalupe’s hotel room. Gau-dalupe went to bed before the police arrived 20 or 30 minutes later. The police took Carlos into custody. Gaudalupe never spoke to the police later in the case. Defendant left his phone at the hotel, and Gaudalupe gave it to the police. Gaudal-upe was shown State’s Exhibit 3-N, and he identified Carlos, himself and defendant in the video. He did not recall speaking to the lady who was in the | ^video, nor did he see anyone vomiting. Gaudalupe and Carlos are seen laughing on the tape after *757 defendant jumped into the pool in his underwear. Gaudalupe and Carlos left defendant alone in the pool area. He did not recall if Carlos went by the hot tub that night. Gaudalupe went to the bathroom near the pool area. After he exited the bathroom and before going upstairs, Gau-dalupe checked to see if his cousins were still in the area. He does not remember having any trouble opening the door to the pool area that night. Gaudalupe identified defendant on the video walking through the hotel lobby in his underwear. Gaudal-upe was never accused of a crime, and he cooperated with the police.
Detective Jeff Adams of the Kenner Police Department testified that he conducted a criminal investigation of a sexual assault at the Comfort Inn Suites on March 6, 2011. He reported to the scene approximately 30 to 45 minutes after the incident was reported. Adams interviewed Carlos and Bernardo at the hotel, and Emily, Jeffrey, and the victim at the hospital. Adams took a recorded statement from Carlos after advising him of his rights. A warrant was put out for Carlos’s arrest for being a principal to simple rape. Evidence, collected from the scene, was submitted for DNA testing. Evidence from the hospital, including a Rape Kit, was collected and submitted for DNA testing as well. Adams reviewed the surveillance video in this case. He also obtained defendant’s phone and obtained a search warrant for it. Adams tried to set up a meeting with Gaudalupe but was unsuccessful. In order to get a photo of defendant, Adams subpoenaed phone records to get personal information, including an address. Ultimately, Adams went through the U.S. Marshal’s Task Force to obtain a registration for defendant’s vehicle; he then was able to obtain a photograph from defendant’s driver’s license. Adams testified that he placed defendant’s photo in a lineup and forwarded the array to the Tuscaloosa Police Department, where the victim and witnesses resided. 11sBased on Emily’s identification, an arrest warrant was issued for defendant. Adams further identified defendant in court.
Defendant testified that around March 6, 2011, he was invited by his cousin Gau-dalupe to stay with him for Mardi Gras. Defendant drove his own vehicle because he had to work on Sunday in the afternoon. Defendant testified that he had a job scheduled at noon on Sunday in Pear-land, Texas, close to Houston. He and the others in his group arrived in the New Orleans area on Friday night. After arriving, defendant and his group went to the French Quarter and became intoxicated. Following that, they returned to the hotel and went to the pool area. Defendant slept most of the following day into the evening and decided to “go back to Mardi Gras.” Defendant testified that he did not consume as much alcohol because he knew that he had to work on Sunday and did not want to get a “hangover.” The group arrived back at the hotel at approximately 4:00 or 5:00 a.m.
After returning to the hotel, defendant and his cousins, Carlos and Lupe,[14] went downstairs to the pool area. Defendant testified they pushed him into the water fully clothed. Defendant testified that he decided to swim in his underwear. At the time, the people in the pool area were defendant, his two cousins, one couple that was leaving and another couple inside of the jacuzzi. Defendant testified that the couple in the jacuzzi seemed like they wanted to be left alone; so, he did not *758 bother them. While he was swimming, he did not know where the other people were. Defendant was shown an image of the pool area and asked to identify where the victim was. He indicated that she was with a man on the other side of the room, and they appeared to be “interacting.” He did not recall if Carlos was still there.
| ^Defendant noted that when the other couple left, he was alone with the couple who remained in the pool area. When he went back inside, he saw a man vomiting and decided to “help him out.” The woman was sitting in the jacuzzi area leaning on the ledge. He testified that his reaction was to pick her up or else she would drown, since her boyfriend was intoxicated. Defendant said that he went inside the pool, grabbed the woman and pulled her out. As defendant was doing this, the man who had previously walked out came back into the pool area and said, “I got this.” Defendant testified that he grabbed his clothes and noticed the time, 5:30 a.m. He realized that he had enough time to make it to work at noon. Defendant claimed that the man never accused him of raping the victim. He left the victim in the care of her friends and put on dry clothes. Per his testimony, defendant in his mind never thought that he had committed a crime: the woman he helped out of the pool was fully clothed in a bikini; and the man throwing up was wearing shorts. He believed the man and the woman were a couple. After dressing upstairs, defendant exited the back door of the hotel and headed back to Houston. At that time he did not believe anyone had accused him of a crime.
Defendant testified that he made it back to Houston for noon. He had left his cell phone behind. Upon returning to Houston, he worked from noon until midnight. Defendant never got his cell phone back. His cousin Gaudalupe told him that he had hired an attorney shortly after the event, who eventually became defendant’s attorney. Defendant testified that he found out months later, while he was in Mexico, that there was a warrant out for his arrest. Per his testimony, defendant, an American citizen, was in Mexico on a family vacation. Defendant was called by his mother and provided with defense counsel’s phone number. In speaking with counsel, defendant was advised to turn himself in. His family then dropped him off at the Mexican border, and his mother was going to meet him on | lfithe other side. When defendant crossed the border, however, he was arrested when he passed through Customs and eventually transferred from Texas to Jefferson Parish. Defendant did not believe that he raped, attempted to rape, or inappropriately touched anyone on the day in question.
On cross-examination, defendant testified that the day after he returned to Texas, he was visited by his cousins, Carlos and Gaudalupe. They told him that they had been “partying” and that they were interviewed by police. They did not tell defendant what was said to the police. Regarding the work that defendant did once he returned to Texas, defendant admitted that he would have been up for 33 hours straight, considering that he woke up in the late afternoon on Saturday and stayed awake through midnight on Sunday.
Defendant demonstrated how he contends he helped the victim out of the pool or hot tub while she was passed out. He said that he jumped into the water while in his underwear. He brought her up and laid her down on the side of the pool with her feet dangling. He testified that the victim was completely clothed. She was never naked or semi-nude when defendant saw or touched her. Jeff walked in as defendant was moving the victim, and said, *759 “I got this.” Defendant did not know what his cousin Carlos was doing while all of this was taking place. Defendant denied walking past the hot tub before helping the woman out. He never interacted with the couple before.
When defendant went out on Saturday-night, he testified that it was always his intention to drive to Houston the next morning. Per his testimony, he did not care if he was going to drive drunk or sober. Although defendant and his cousins decided to go down to the pool area on Saturday night, none of them brought bathing suits or towels down with them. Defendant said that he was comfortable swimming in his underwear. Three persons rode with defendant from Houston to | UiNew Orleans and brought minimal baggage with them. When defendant left, the former passengers of his car would have to ride with two others in a Nissan four-door vehicle.
At trial, defendant was shown the video of the pool area and identified himself on the video looking to see if the pool was open. He saw people in the pool area. Defendant testified that he was not intoxicated that morning. His cousin Juan is seen on the video either signaling or motioning to defendant. Defendant was staggering on the video when seen walking down the hall. When he returned upstairs to his room and got ready to leave for Houston, he testified that he told his friends and cousins that he had just saved a girl in the hot tub. The only time defendant used the back stairs of the hotel was when he left to return to Houston.
Reymundo Gonzales testified that he was employed by the Hidalgo Police Department in Hidalgo, Texas, a town near the border to Mexico. Gonzales participated in the arrest of defendant at the Hidalgo Port of Entry, specifically on the Hidalgo transfer bridge. United States Customs notified Gonzales that defendant had an open warrant out for his arrest, following which Gonzales transported defendant to the Hidalgo Police Department facility. Defendant was identified by Gonzales in court as the man that he arrested.

LAW AND DISCUSSION

While defendant argues in his single assignment of error that the trial court erred in denying his motion for new trial, he concedes in his brief that no such motion was filed in the trial court. Under similar circumstances, where the defendant challenged the sufficiency of the evidence used to convict him and he failed to file a motion for new trial, the Louisiana Supreme Court has held that a review of sufficiency is permissible. For example, in State v. Fontana, 396 So.2d 1251 (La.1981), the Supreme Court explained:
117Pefendant filed no motion for acquittal or for new trial. However, this omission no longer precludes review, as it once did, for we have held that a refusal to review an allegation that the state failed to present any evidence of the crime charged (or of an essential element) simply because no such motions have been filed is patently unfair and denies the defendant due process. State v. Boutte, 384 So.2d 773 (La.1980); State v. Peoples, 383 So.2d 1006 (La.1980). Moreover, the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and adopted by this court in recent cases, requires us to determine not whether there is any evidence to support the conviction, but whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime proved be *760 yond a reasonable doubt.[15]
Accordingly, we find that the assignment of error is in the proper posture for review.
Defendant argues in his assignment of error that the evidence was insufficient. Specifically, defendant argues that no witnesses saw him commit any act toward the accomplishment of a simple rape. Defendant further contends that the State’s witnesses were unreliable.
Conversely, the State asserts that the record supports defendant’s conviction through the testimony of eyewitnesses and the hotel surveillance video.
The standard for appellate review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 448 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722, (1998); State v. Barnes, 98-932 (La.App. 5 Cir. 2/10/99), 729 So.2d 44, 46, writ denied, 99-1018 (La.9/17/99), 747 So.2d 1099.
Under Jackson, supra, a review of a criminal conviction record for sufficiency of evidence does not require a court to ask whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Barnes, 98-932, 729 So.2d at 46. A reviewing court is required to consider the whole record and determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. Id.
“Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts.” State v. Kempton, 01-572, p. 7 (La.App. 5 Cir. 12/12/01), 806 So.2d 718, 722. “The rule as to circumstantial evidence is; assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83 (quotation omitted).
In this case, defendant was convicted of attempted simple rape. Rape is “the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person’s lawful consent.” La. R.S. 14:41(A). Simple rape, in pertinent part, is defined by La. R.S. 14:43 as:
A. Simple rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a|19yictim because it is committed under any one or more of the following circumstances:
*761 (1) When the victim is incapable of resisting or of understanding the nature of the act by reason of a stupor or abnormal condition of mind produced by an intoxicating agent or any cause and the offender knew or should have known of the victim’s incapacity.
La. R.S. 14:27(A) defines attempt as follows:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
La. R.S. 14:10 defines “simple criminal intent” as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Specific intent may be inferred from the circumstances of a transaction and from the actions of the accused. Further, specific intent is a legal conclusion to be resolved by the fact-finder. State v. Graham, 420 So.2d 1126 (La.1982).
Regarding the element detailed in La. R.S. 14:43(A)(1), testimony of the witnesses at trial relevant to the victim’s physical state at the time she was allegedly assaulted, including that of defendant and the victim, was consistent in that all accounts describing the victim as being intoxicated to the point of unconsciousness or incapacity.
Defendant contends that the evidence against him was deficient in several respects. He asserts that no eyewitnesses saw him attempt to rape the victim, nor did the victim testify that defendant attempted to rape her. While defendant is correct that the victim had no recollection of events whatsoever, the jury was presented with the testimony of two eyewitnesses, Jeffrey Dodson and Bernardo Munoz, who saw defendant in the hotel hot tub, naked from the waist down and with an erection, closely positioned between the legs of the victim, who had been | ¡^disrobed of her bikini bottom. Defendant also asserts that, “No one knew how [the victim’s] bikini bottoms were removed.” However, the jury heard the testimony of Jeffrey Dodson and Emily Ratliff who recalled consistently that before leaving the victim in the pool area with Bernardo, the victim was fully clothed. Jeff further testified that when he returned to the pool area several minutes later, the victim had been either partially or fully undressed and was being held by defendant in the hot tub. Given the evidence that Bernardo was vomiting while passed out and lying on the ground, that the victim was completely physically incapacitated, combined with the fact that her bikini bottom was found several feet away, and that defendant was also nude from the waist down with an erection, positioned between the victim’s legs in close proximity to her, we conclude that a rational juror could have found proof that defendant was the individual who undressed the victim, thereby committing an act in furtherance of the attempted simple rape and demonstrating specific intent. In addition, testimony established that the victim was outside of the hot tub when Jeff and Emily left, but had been put into the water of the hot tub at the time defendant was discovered holding her. Thus, the jury could have concluded that defendant committed yet another act in furtherance of the attempted simple rape of the victim. The jury could further have concluded that defendant’s flight was due to consciousness of guilt.
Defendant challenges the credibility of the State’s witnesses. First, he *762 claims that Bernardo’s testimony that he woke up and saw defendant’s erect penis several feet away from him “is suspect because [Bernardo] was so drunk he had been vomiting and was passed out moments before.” Similarly, he challenges Jeffs testimony by insinuating that he contradicted other witnesses when he said that he had not smoked marijuana on the trip. The jury was made aware of Bernardo’s intoxicated condition at the time of the assault through his own |⅞1 admission and the testimony of several other witnesses; likewise, Jeff was questioned on the stand as to whether he had used marijuana prior to the incident. Citing the Louisiana Supreme Court, the Fourth Circuit has noted, regarding a witness who candidly testifies about his intoxication on the day of the crime, “[t]he jury, as finder of fact, was entitled to attach as much or as little weight to the testimony as it deemed appropriate. See State v. Sejours, 113 La. 676, 37 So. 599 (1905).” State v. Hall, 464 So.2d 966 (La.App. 4 Cir.1985). In this case, the jury apparently found Bernardo’s and/or Jeffs testimony credible. The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. It is not the function of the appellate court to second-guess the credibility of witnesses as determined by the trier of fact or to reweigh the evidence. State v. Stec, 99-633 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.
Defendant further suggests that there was conflicting testimony between Bernardo and Jeff pertaining to the position of the victim’s legs at the time defendant was discovered in the hot tub with the victim. Bernardo testified that he saw defendant holding the victim’s legs up, while Jeff testified that he saw the victim’s legs wrapped around defendant. What is consistent about Jeffs and Bernardo’s testimony is defendant’s position between the victim’s legs, his own state of undress, and the victim’s state of undress. However, even assuming this is a discrepancy, where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, it is a matter of the weight of the evidence and not the sufficiency of the evidence. State v. Brooks, 00-106 (La.App. 5 Cir. 9/26/00), 769 So.2d 1242, 1245. Further, in the absence of internal contradiction or irreconcilable conflict with physical | ^evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Benoit, 07-35 (La.App. 5 Cir. 5/29/07), 960 So.2d 279, 284. “[T]he Jackson standard does not serve as a vehicle for a reviewing court to second-guess the rational credibility determinations of the fact finder at trial.” State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291, 1293.
We find that, viewing the evidence in the light most favorable to the prosecution, the jury could have found the essential elements of attempted simple rape beyond a reasonable doubt. The fact that the victim was intoxicated to the point of incapacity was not contested. Circumstantial evidence presented showed that the victim was fully clothed and outside of the hot tub while with her friends, but had been at least partially disrobed when found with defendant in the hot tub minutes after they had left. The testimony of two witnesses established that defendant was naked from the waist down with an erection while positioned between the victim’s legs at the time he was discovered. From this, we conclude that a rational trier of fact could have found that defendant demonstrated specific intent to attempt to rape the victim while she was unconscious, *763 thereby establishing guilt beyond a reasonable doubt.
Accordingly, there is no merit to this assignment of error.

ERRORS PATENT DISCUSSION

Defendant requests an errors patent review. However, this Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request.
The commitment for defendant’s sentence reflects that defendant received a proper advisal of the prescriptive period for filing for post-conviction relief in accordance with La.C.Cr.P. art. 930.8. However, the transcript for sentencing | ^reflects an incomplete advisal: “Two years to appeal the final judgment on post-conviction.” The transcript prevails when there is a discrepancy between the commitment and the transcript. See State v. Lynch, 441 So.2d 732, 734 (La.1983). This Court advises defendant, by this opinion, that no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922. See State v. Brooks, 12-226, pp. 13-14 (La.App. 5 Cir. 10/30/12), 103 So.3d 608, 615, writ denied, 12-2478 (La.4/19/13), 111 So.3d 1030.
Next, the record includes a Uniform Commitment Order regarding the sentence which reflects that the “adjudication date” was March 11, 2013, when defendant was actually convicted on February 22, 2013 and his sentencing date was March 11, 2013. This Court has previously remanded a matter for correction of the Uniform Commitment Order after noting a discrepancy. See State v. Long, 12-184, pp. 10-11 (La.App. 5 Cir. 12/11/12), 106 So.3d 1136, 1142. We therefore remand for correction of the commitment and order that copies of the corrected commitment be sent to the officer in charge of the institution where defendant has been sentenced and to the Department of Corrections’ Legal Department.

DECREE

For the foregoing reasons, defendant’s conviction and sentence are affirmed; the matter is remanded for correction of an error patent as noted herein.

CONVICTION AND SENTENCE AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENT.

. In accordance with La. R.S. 46:1844(W)(1), to protect the identity of the victim, she will be referred to by the initials, D.V.

. This group also included Dan Whittlesey, who did not testify at trial.

. The lineup was marked as State's Exhibit 11.

. The 911 call was introduced as State's Exhibit 6 over defendant’s objection.

. State’s Exhibit 4, a representation of the hotel layout, was introduced in connection with Cohen’s testimony.

.The record later indicates that this individual was Detective Jeff Adams of the Kenner Police Department.

. The record later indicates that Juan Uribe is the defendant’s cousin.

. State’s Exhibit 2 was introduced in connection with Deputy Triguero's testimony.

. State’s Exhibit 3 consisted of photos of various bath towels, bedsheets, a lounge chair cushion, a buccal swab, and a hospital report.

. The three discs of hotel video were also introduced under State’s Exhibit 3.

. In connection with Dr. Tropez-Martin’s testimony, the report she prepared regarding her examination of the victim was introduced as State's Exhibit 8.

. In connection with her testimony, the State introduced Exhibit 10, a DNA Issue Report.

. Vargas refers to Juan Uribe as "Carlos”. Hence, Uribe will be referred to as "Carlos” throughout the remainder of this Opinion.

. Defendant appears to be referring to his cousin Gaudalupe by the nickname "Lupe” throughout his testimony.

. Accord, State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, writ denied, 06-1894 (La.4/20/07), 954 So.2d 154. ("The proper procedural vehicle for raising the issue of the sufficiency of the evidence is a motion for post-verdict judgment of acquittal. La. C.Cr.P. art. 821; State v. Allen, [supra] [440 So.2d 1330 (La.1983)]. However, the failure to file a motion for post-verdict judgment of acquittal does not preclude appellate review of the sufficiency of the evidence. State v. Washington, 421 So.2d 887, 889 (La.1982); State v. Carey, 04-1073 (La.App. 5 Cir. 3/29/05), 901 So.2d 509, 512, n. 4.”)